NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12276

SREYNUON LUNN  vs.  COMMONWEALTH & another.[1]


Suffolk.     April 4, 2017. - July 24, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, Lowy, Budd,
& Cypher, JJ.


Alien.  Arrest.


Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on February 7, 2017.

The case was reported by Lenk, J.


Emma C. Winger (Mark Fleming, of New York, & Alyssa
Hackett, Committee for Public Counsel Services, also present)
for the petitioner.
Joshua S. Press, of the District of Columbia, for the
United States.
Jessica V. Barnett, Assistant Attorney General (Allen H.
Forbes, Special Assistant Attorney General, & Sara A. Colb,
Assistant Attorney General, also present) for the Commonwealth &
another.
The following submitted briefs for amici curiae:
Sabrineh Ardalan, of New York, Philip L. Torrey, Mark C.
Fleming, & Laila Ameri for Immigration and Refugee Clinical
Program at Harvard Law School.
Christopher N. Lasch, of Colorado, for David C. Baluarte &
others.

_____

[1] Sheriff of Suffolk County (sheriff), intervener.

Karen Pita Loor for Criminal Defense Clinic at Boston University School of Law.

Omar C. Jadwat, of New York, Spencer E. Amdur, of Pennsylvania, Cody H. Wofsy, of California, Matthew R. Segal, Jessie J. Rossman, Laura Rótolo, Carlton E. Williams, Kirsten V. Mayer, Kim B. Nemirow, & Laura Murray-Tjan for Bristol County Bar Advocates, Inc., & others.

BY THE COURT. After the sole pending criminal charge against him was dismissed, the petitioner, Sreynuon Lunn, was held by Massachusetts court officers in a holding cell at the Boston Municipal Court at the request of a Federal immigration officer, pursuant to a Federal civil immigration detainer. Civil immigration detainers are documents issued by Federal immigration officers when they wish to arrest a person who is in State custody for the purpose of removing the person from the country. By issuing a civil detainer, the Federal officer asks the State custodian voluntarily to hold the person for up to two days after he or she would otherwise be entitled to be released from State custody, in order to allow Federal authorities time to arrive and take the person into Federal custody for removal purposes.

The United States Supreme Court has explained that, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States," Arizona v. United States, 567 U.S. 387, 407 (2012), and that the Federal administrative process for removing someone from the country "is a civil, not

criminal, matter." Id. at 396. Immigration detainers like the one used in this case, for the purpose of that process, are therefore strictly civil in nature. The removal process is not a criminal prosecution. The detainers are not criminal detainers or criminal arrest warrants. They do not charge anyone with a crime, indicate that anyone has been charged with a crime, or ask that anyone be detained in order that he or she can be prosecuted for a crime. Detainers like this are used to detain individuals because the Federal authorities believe that they are civilly removable from the country.

It is undisputed in this case that holding someone in circumstances like this, against his or her will, constitutes an arrest under Massachusetts law. The question before us, therefore, is whether Massachusetts court officers have the authority to arrest someone at the request of Federal immigration authorities, pursuant to a civil immigration detainer, solely because the Federal authorities believe the person is subject to civil removal. There is no Federal statute that confers on State officers the power to make this kind of an arrest. The question we must answer is whether the State law of Massachusetts authorizes such an arrest. To answer the question, we must look to the long-standing common law of the Commonwealth and to the statutes enacted by our Legislature. Having done so, we conclude that nothing in the statutes or

common law of Massachusetts authorizes court officers to make a civil arrest in these circumstances.[2,3]

Background. Lunn was arraigned in the Boston Municipal Court on October 24, 2016, on a single count of unarmed robbery. The day before the arraignment, the United States Department of Homeland Security (department) issued a civil immigration detainer against him. The detainer document was a standard form document then in use by the department. It requested, among other things, that the Massachusetts authorities continue to hold Lunn in State custody for up to two days after he would otherwise be released, in order to give officers of the department time to arrive and take him into Federal custody.[4]

---

[2] Given this conclusion, we do not address whether such an arrest, if authorized, would be permissible under the United States Constitution or the Massachusetts Declaration of Rights.

[3] We acknowledge the amicus briefs submitted by the Immigration and Refugee Clinical Program at Harvard Law School; the Criminal Defense Clinic at Boston University School of Law; Bristol County Bar Advocates, Inc., Massachusetts Association of Criminal Defense Lawyers, Pilgrim Advocates, Inc., and Suffolk Lawyers for Justice, Inc.; and thirty academics in the field of immigration law.

We also acknowledge the brief filed by the United States as amicus curiae. In addition, we allowed the motion of the United States to participate in the oral argument of the case. Mass. R. A. P. 17, as amended, 426 Mass. 1602 (1998).

[4] The detainer was addressed to the Boston police department and any other Massachusetts authorities that subsequently assumed custody of Lunn. The detainer form states, "This request takes effect only if you serve a copy of this form on the subject . . . ," and provides space for "the law enforcement

Bail was set at the arraignment in the amount of $1,500. Lunn did not post bail and, according to the trial court docket, was committed to the custody of the sheriff of Suffolk County (sheriff) at the Suffolk County jail in lieu of bail.[5]

Lunn was brought back to court for trial on February 6, 2017.[6] He was transported from the jail to the court house by

_____

agency currently holding the subject of the notice" to indicate when and how it was served. Lunn does not appear to have been served with a copy of the detainer by the police, the sheriff, or the court, although he acknowledges that he was told of it by his counsel.

[5] An entry was made on the trial court docket stating that the petitioner was "held on . . . [the] detainer." This entry, to the extent it suggests that the petitioner was actually being held in custody pursuant to the Federal immigration detainer, is misleading. At no point before trial was he actually held pursuant to the detainer. He was held in lieu of bail while awaiting trial in the present case and, for a brief period, on a criminal sentence in a separate case (see note 6, infra). The detainer by its own terms requested that he be detained only if and when he was to be released from State custody.

[6] Several additional events occurred between the time of arraignment and the time of trial that, although not essential to our decision, are worth noting. First, Lunn was transferred at some point to the custody of the sheriff of Norfolk County to serve a sentence (at the Norfolk County house of correction) in a separate criminal case from Norfolk County. When that sentence was completed, on or about January 13, 2017, he was returned to the custody of the sheriff of Suffolk County and held in lieu of bail awaiting trial in this case.

Second, on November 21, 2016, the trial court allowed the Commonwealth's motion to amend the criminal complaint in the case, with Lunn's consent, by reducing the charged offense from unarmed robbery (G. L. c. 265, § 19 [b]) to larceny from a person (G. L. c. 266, § 25 [b]).

Third, on January 20, 2017, a judge in the Superior Court,

personnel from the office of the sheriff, and was delivered into the custody of the trial court's court officers. Because the Commonwealth was not ready for trial at that time, the judge dismissed the case for lack of prosecution.[7] At that point there were no longer any criminal charges pending against Lunn in Massachusetts. Lunn's counsel informed the judge of the outstanding detainer and asked that Lunn be released from custody notwithstanding the detainer, the criminal case having been dismissed. The judge declined to act on that request.[8] Lunn remained in the custody of the court officers; it appears that he was kept in a holding cell in the court house. Several hours later -- the record before us does not specify exactly how long -- department officials arrived at the court house and took Lunn into Federal custody.

The following morning, February 7, 2017, Lunn's counsel

_____

acting on a request for bail review, G. L. c. 276, § 58, reduced the amount of Lunn's bail to $750. Although Lunn was financially able to post that amount, he declined to do so on the belief that he would then be held anyway on the outstanding detainer.

[7] This was the second scheduled trial date. The Commonwealth had not been ready for trial on the first date, so the case was continued to February 6, 2017.

[8] The docket entry in this respect originally stated that Lunn's request to be released had been "heard and denied." The entry was later changed (after the case was entered in this court) to state that "[n]o action" was taken on the request. The parties agree that the amended entry accurately reflects the judge's statement, made in response to Lunn's request, that he "decline[d] to take any action on the detainer."

filed a petition in the county court on his behalf, pursuant to G. L. c. 211, § 3, asking a single justice of this court to order the Boston Municipal Court to release him.[9]  The petition alleged, among other things, that the trial court and its court officers had no authority to hold Lunn on the Federal civil detainer after the criminal case against him had been dismissed, and that his continued detention based solely on the detainer violated the Fourth and Fourteenth Amendments to the United States Constitution and arts. 12 and 14 of the Massachusetts Declaration of Rights.  By that time, however, Lunn had already been taken into Federal custody.  The single justice therefore considered the matter moot but, recognizing that the petition raised important, recurring, and time-sensitive legal issues that would likely evade review in future cases, reserved and reported the case to the full court.

Discussion.  1.  <u>Civil versus criminal immigration enforcement</u>.  The principal statute governing immigration in the United States is the Immigration and Nationality Act (act), 8 U.S.C. §§ 1101 et seq.  It sets forth in elaborate detail the

_____

[9] Previously, two other Supreme Judicial Court single justices, acting on similar petitions pursuant to G. L. c. 211, § 3, had ruled that Massachusetts trial courts have no authority to hold a defendant, or otherwise order him or her to be held, on a Federal civil immigration detainer.  Nelson Maysonet <u>vs</u>. Commonwealth, Supreme Judicial Court, No. SJ-2016-346 (Aug. 12, 2016).  Santos Moscoso <u>vs</u>. A Justice of the E. Boston Div. of the Boston Mun. Ct., Supreme Judicial Court, No. SJ-2016-168 (May 26, 2016).

terms, conditions, and procedures for admitting individuals into the United States who are not citizens or nationals of this country (referred to in the act as "aliens," 8 U.S.C. § 1101[a][3]), as well as the terms, conditions, and procedures for removing those individuals from the country.  Some violations of the act are criminal offenses.  It is a crime, for example -- punishable as a misdemeanor for the first offense -- for an alien to enter the country illegally.  8 U.S.C. § 1325(a).[10]  Immigration crimes are prosecuted in the Federal District Courts, like any other Federal crimes.

Many violations of the act are not criminal offenses. Being present in the country illegally, for example, is not by itself a crime.  Illegal presence without more is only a civil violation of the act that subjects the individual to possible removal.  8 U.S.C. § 1227(a)(1)(B).  See Arizona, 567 U.S. at 407; Melendres v. Arpaio, 695 F.3d 990, 1000-1001 (9th Cir. 2012) ("[U]nlike illegal entry, mere unauthorized presence in

---

[10] Other immigration crimes include failing to carry a registration card, 8 U.S.C. § 1304(e); wilfully failing to register, making fraudulent statements in connection with registration, or counterfeiting registration documents, id. at § 1306; knowingly bringing in, transporting, or harboring an alien, id. at § 1324; engaging in a pattern or practice of illegally hiring aliens, id. at § 1324a(f); operating a commercial enterprise for the purpose of evading immigration laws, id. at § 1325(d); and illegally reentering the country after having previously been removed, id. at § 1326.  There is no indication in the record before us that Lunn entered the country illegally or committed any immigration crime.

the United States is not a crime").[11]

    Significantly, the administrative proceedings brought by Federal immigration authorities to remove individuals from the country are civil proceedings, not criminal prosecutions.  See Arizona, 567 U.S. at 396.  See also 6 C. Gordon, S. Mailman, S. Yale-Loehr, & R.Y. Wada, Immigration Law and Procedure § 71.01[4][a] (Matthew Bender, rev. ed. 2016) (acknowledging "the uniform judicial view, reiterated in numerous Supreme Court and lower court holdings, . . . that [removal] is a civil consequence and is not regarded as criminal punishment").  This is true even where the alleged basis for removal is the

_____

[11] Other civil immigration violations include engaging in unauthorized work, 8 U.S.C. § 1227(a)(1)(C)(i); failing to remove alien stowaways from vessels and aircraft, id. at § 1253(c)(1); and wilfully failing or refusing to depart from the country after a final order of removal, id. at § 1324d(a). The latter potentially has both civil and criminal consequences. See id. at §§ 1253(a), 1324d(a).

    Although there was a final order of removal outstanding against Lunn, issued in 2008, there is no indication in the record before us that he wilfully failed or refused to depart pursuant to that order.  The United States represents in its brief that the reason Lunn was not actually removed pursuant to the 2008 order is that "his country of origin declined to provide travel documents."  He was instead released from Federal detention in 2008 on supervision.  See 8 U.S.C. § 1231(a).  We note that he was again released from Federal detention, for the same reason, in May, 2017, approximately three and one-half months after he was taken into Federal custody in this case. Boston Globe, Immigrant Who Can't Be Deported to Cambodia Released from Detention, May, 2017, https://www.bostonglobe.com /metro/2017/05/24/immigrant-who-can-deported-cambodia- challenges-his-detention/JZ6PUrPNYK125ZbdKbaM0N/story.html [https://perma.cc/3S8E-SXJB].

commission of a criminal offense.  Aliens are subject to removal from the country for a variety of reasons.  For example, an individual is subject to removal if he or she was inadmissible at the time of entry into the country or has violated the terms and conditions of his or her admission, 8 U.S.C. § 1227(a)(1)(A)-(D); has committed certain crimes while in the country, id. at § 1227(a)(2); is or at any time after admission into the country has been a drug abuser or addict, id. at § 1227(a)(2)(B)(ii); presents certain security or foreign policy risks, id. at § 1227(a)(4); has become a public charge, id. at § 1227(a)(5); or has voted illegally, id. at § 1227(a)(6). Removal proceedings are heard and decided by executive branch immigration judges appointed by the United States Attorney General, who operate within the Department of Justice's Executive Office for Immigration Review.  Id. at § 1101(b)(4).

2.  Use of civil immigration detainers.  The type of immigration detainer issued by the department in this case was Form I-247D, entitled "Immigration Detainer - Request for Voluntary Action."  It was one of three different types of forms then being used by the department to notify State authorities that they had in their custody a person believed by the department to be a removable alien, and to indicate what action the department was asking the State authorities to take with

respect to that person.[12]

Form I-247D was to be completed and signed by a Federal immigration officer. In part 1.A of the form, the officer was asked to indicate, by checking one or more of six boxes, a basis on which the department had determined that the person in custody was "an immigration enforcement priority."[13] The officer in this case checked the box stating that Lunn "has been convicted of a 'significant misdemeanor' as defined under [department] policy." There was no indication on the form what that misdemeanor was, whether it was a Federal or State offense, when it occurred, or when he was convicted.

Part 1.B of the form stated that the department had determined that there was probable cause to believe that the person in custody was a removable alien, and required the officer completing the form to indicate, by checking one or more

---

[12] The other two forms were Form I-247N, entitled "Immigration Detainer - Request for Voluntary Notification of Release of Suspected Priority Alien," and Form I-247X, entitled "Request for Voluntary Transfer." Neither of those forms was used in this case. The Federal government has since rescinded all three forms and replaced them with a single new form, described in note 17, infra.

[13] The "enforcement priority" language referred to certain prioritized bases for removal that were set forth in a "priority enforcement program" that was then in effect. The program is no longer in effect. It has been terminated pursuant to an executive order of the President of the United States. See Exec. Order No. 13768, Enhancing Public Safety in the Interior of the United States, 82 Fed. Reg. 8799, 8801, at § 10(a) (Jan. 25, 2017).

of four boxes, the basis for that determination.  In this case the officer checked two boxes:  the first stated that there was "a final order of removal against the [petitioner]"; and the second stated that there was "biometric confirmation of the [petitioner's] identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the [petitioner] either lacks immigration status or notwithstanding such status is removable under [United States] immigration law."  The detainer did not provide any specific details as to the order of removal.[14]

The detainer form stated that the department "requested" the custodian of the subject of the detainer to do three things: (1) "[s]erve a copy of this form on the subject and maintain custody of him/her for a period NOT TO EXCEED 48 HOURS beyond the time when he/she would otherwise have been released from your custody to allow [the department] to assume custody";[15] (2)

---

[14] The final order of removal was issued in 2008.  Despite the order, the Federal authorities were unsuccessful in actually removing Lunn.  See note 11, supra.  There is no indication in the record that they did not know how to find him in 2016 when they issued the detainer in this case, that he presented a flight risk, or that the reason they were unable to remove him previously had subsided.

[15] As stated in note 4, supra, there is no indication in the record before us that a copy of the form was ever served on Lunn by any of his Massachusetts custodians -- the police, the sheriff, or the trial court.  The parties stipulate that he was not served by the sheriff or by the court.  The United States claims in its brief that it appears that he was served, citing

notify the department at a given telephone number "[a]s early as possible prior to the time you otherwise would release the subject"; and (3) "[n]otify this office in the event of the subject's death, hospitalization or transfer to another institution."[16]

In short, this was a civil immigration detainer.  It alleged that Lunn was subject to, and was being sought by the Federal authorities for the purpose of, the civil process of removal.  It was not a criminal detainer or a criminal arrest warrant.  It did not allege that the Federal authorities were seeking Lunn for a criminal immigration offense or any other Federal crime, for purposes of a criminal prosecution.[17]

-----

the page of the trial court docket that states he was "held on . . . [the] detainer" (see note 5, supra), although the docket makes no mention of the detainer having been served.  The only copy of the detainer in the record is blank in the spaces provided for date and manner of service.

[16] This case involves only the first request in the detainer, i.e., that a custodian continue to hold an individual after he or she is entitled to be released.  The other two requests are not at issue in this case, and we therefore need not and do not address them.

[17] On March 24, 2017, the Federal government, effective April 2, 2017, rescinded Forms I-247D, I-247N, and I-247X, and replaced them with a single new form, Form I-247A, entitled "Immigration Detainer - Notice of Action."  Like Form I-247D, it states that the Department of Homeland Security (department) has determined that probable cause exists to believe that the subject is a removable alien, and requires the immigration officer completing the form to indicate, by checking one or more boxes, the basis on which that determination was made.  It also states that "[t]he alien must be served with a copy of this form

In Massachusetts, an immigration detainer form of this type

will typically travel with its subject as he or she is

---

for the detainer to take effect," and it provides blank spaces, to be filled in by the custodian, indicating the date and manner of service.  Significantly, like Form I-247D, it "request[s]" that the custodian "[n]otify [the department] as early as possible (at least 48 hours, if possible) before the alien is released from [the custodian's] custody," and "[m]aintain custody of the alien for a period NOT TO EXCEED 48 HOURS beyond the time when he/she would otherwise have been released from [the custodian's] custody to allow [the department] to assume custody."

Pursuant to a written policy dated March 24, 2017, of United States Immigration and Customs Enforcement, the agency within the department responsible for identifying and apprehending removable aliens, new Form I-247A must be accompanied by one of two other forms:  Form I-200, entitled "Warrant for Arrest of Alien," or Form I-205, entitled "Warrant of Removal/Detention."  The latter applies when the individual named in the detainer is subject to a final order of removal, and may be signed by any of the thirty-two types of immigration officials designated in 8 C.F.R. § 241.2(a)(1); the former applies when the named individual is a removable alien not yet subject to a final order of removal, and may be signed by any of the fifty-three types of immigration officials designated in 8 C.F.R. § 287.5(e)(2).  These are civil administrative warrants approved by, and directed to, Federal immigration officials. Neither form requires the authorization of a judge.  Neither form is a criminal arrest warrant or a criminal detainer.

Unlike old Form I-247D, new Form I-247A does not contain a statement indicating that the individual named in the detainer is an "enforcement priority," or any specific basis for such a determination.  See note 13, supra.  Without this information, the State custodian will not know, from the new form, the reason alleged for seeking removal, e.g., whether the individual is believed to be a threat to national security or has just briefly overstayed a lawfully issued visa.  In cases where Form I-205 is used, i.e., when there has been a final order of removal, the immigration officer completing that form must indicate the provisions of the Immigration and Nationality Act (act) on which the order was based; this may provide the State custodian with some information on the claimed basis for removal.

transferred between custodians. In this case, for example, the detainer, originally issued by the department to the Boston police, would have been given by the police to the court officers at the time Lunn was brought into court for arraignment; by the court officers to the sheriff following the arraignment, when Lunn was committed to the sheriff's custody in lieu of bail; and by the sheriff back to the court officers when the defendant was brought into court for trial.

The parties stipulate that it is common in Massachusetts, as apparently happened here, that the courts and law enforcement agencies do not actually serve the subject with a copy of the detainer, as the form requests. The parties further stipulate that "[i]ndividual law enforcement agencies in the Commonwealth may or may not have policies on the subject of [immigration] detainers," and that "[p]olicies and practices vary from one Commonwealth law enforcement agency to another as to whether, or under which circumstances, to honor [such] detainers."

3. Voluntariness of detainers. Federal immigration detainers like Form I-247D, and now Form I-247A, by their express terms are simply requests. They are not commands, and they impose no mandatory obligations on the State authorities to which they are directed. The Federal government, through the detainer, "requests" that it be notified when a person in State custody, whom the Federal government believes to be a removable

alien, is scheduled to be released, and it "requests" that the State authorities voluntarily keep the person in custody for up to two additional days, so that the department can arrive and assume custody of the person.

The United States, in its brief as amicus curiae, concedes that compliance by State authorities with immigration detainers is voluntary, not mandatory.  The government's concession is well founded for at least two reasons.  First, the act nowhere purports to authorize Federal authorities to require State or local officials to detain anyone.  See Galarza v. Szalczyk, 745 F.3d 634, 641 (3d Cir. 2014) ("The [a]ct does not authorize [F]ederal officials to command [S]tate or local officials to detain suspected aliens subject to removal").[18]  Second, the Tenth Amendment to the United States Constitution prohibits the

_____

[18] One of the regulations promulgated pursuant to the act states in part:  "(d) Temporary detention at [d]epartment request.  Upon a determination by the [d]epartment to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed [forty-eight] hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the [d]epartment" (emphasis added).  8 C.F.R. § 287.7(d).  As the United States Court of Appeals for the Third Circuit explained, the regulation's use of the word "shall," correctly understood in the context of the entire statutory and regulatory scheme, does not change the voluntary nature of the detainer.  Galarza v. Szalczyk, 745 F.3d 634, 640 (3d Cir. 2014) ("it is hard to read the use of the word 'shall' in the timing section to change the nature of the entire regulation").  The United States concedes in its amicus brief that this paragraph of the regulation only "defines the maximum length of time that an alien with an immigration detainer may be held.  It does not require local law enforcement agencies to hold anyone."

Federal government from compelling States to employ their resources to administer and enforce Federal programs. See id. at 643-644, citing Printz v. United States, 521 U.S. 898 (1997), and New York v. United States, 505 U.S. 144 (1992) (analyzing constitutional concerns associated with interpreting detainers to be mandatory; "a conclusion that a detainer issued by a [F]ederal agency is an order that [S]tate and local agencies are compelled to follow . . . is inconsistent with the anti-commandeering principle of the Tenth Amendment"). In other words, even if the Federal government wanted to make State compliance with immigration detainers mandatory, the Tenth Amendment likely would prevent it from doing so. The Federal government has also made the same concession in litigation elsewhere, and in various policy statements and correspondence, that State compliance with its detainers is voluntary. See Galarza, supra at 639 n.3, 641-642 (summarizing cases and statements; "In short, the position of [F]ederal immigration agencies has remained constant:  detainers are not mandatory").

4. The requested detention constitutes an arrest. What the department is asking for, when it requests in a civil immigration detainer that a Massachusetts custodian hold a person for up to two days after he or she would otherwise be entitled to release from State custody, constitutes an arrest as a matter of Massachusetts law. An arrest occurs in

Massachusetts, with or without a warrant, when "there is (1) an actual or constructive detention or seizure, (2) performed with the intention to effect an arrest, and (3) so understood by the person detained.  See Commonwealth v. Powell, 459 Mass. 572, 580 (2011)[, cert. denied, 565 U.S. 1262 (2012)]; Commonwealth v. Limone, 460 Mass. 834, 839 (2011).  The subjective understanding of the officer or of the defendant does not control.  Commonwealth v. Avery, 365 Mass. 59 (1974); Commonwealth v. Johnson, 413 Mass. 598 (1992)."  J.A. Grasso, Jr., & C.M. McEvoy, Suppression Matters Under Massachusetts Law § 6-1 (2017).  The United States acknowledged at oral argument in this case that a detention like this, based strictly on a Federal immigration detainer, constitutes an arrest.  The government has made similar concessions in other cases as well.  See, e.g., Moreno v. Napolitano, 213 F. Supp. 3d 999, 1005 (N.D. Ill. 2016) (stating that Federal defendants "concede that being detained pursuant to an . . . immigration detainer constitutes a warrantless arrest").  Cf. Morales v. Chadbourne, 793 F.3d 208, 217 (1st Cir. 2015) ("[W]hile a detainer is distinct from an arrest, it nevertheless results in the detention of an individual. . . .  Because Morales was kept in custody for a new purpose after she was entitled to release, she was subjected to a new seizure for Fourth Amendment purposes -- one that must be supported by a new probable cause justification").

To be sure, it is permissible in certain limited circumstances for a police officer, on making an otherwise lawful stop, to briefly detain an individual for investigatory purposes, even though the individual's liberty is thereby temporarily restrained and he or she is not free to leave.  See, e.g., Commonwealth v. Sinforoso, 434 Mass. 320, 325 (2001); Commonwealth v. Willis, 415 Mass. 814, 819-820 (1993); Commonwealth v. Sanderson, 398 Mass. 761, 765-767 (1986).  See generally Terry v. Ohio, 392 U.S. 1 (1968).  But that is not what happens with a Federal immigration detainer.  When a Massachusetts custodian holds an individual solely on the basis of a civil detainer, the custodian has no investigatory purpose.  Indeed, by its very nature, the detainer comes into play only if and when there is no other basis for the State authorities to continue to hold the individual (e.g., after he or she has posted bail or been ordered released on personal recognizance; or after he or she has completed serving the committed time on a criminal sentence; or, as in this case, after pending charges have been dismissed).  The sole purpose of the detention is to maintain physical custody of the individual, so that he or she remains on the premises until the Federal immigration authorities arrive and take him or her into Federal custody to face possible removal.  Moreover, the requested detention is not necessarily brief.  The department, by its detainer, asks for a

detention of up to two full days.

What happened in this case, therefore, was plainly an arrest within the meaning of Massachusetts law. Lunn was physically detained in a holding cell, against his will, for several hours. He was otherwise entitled to be free, as no criminal charges were then pending against him and there was no other basis under Massachusetts law to hold him. The sole basis for holding him was the civil immigration detainer. The question, then, is whether the court officers who held him had the authority to arrest him on the basis of a civil detainer.

5. Authority of court officers to arrest. Court officers in Massachusetts, while on court house premises, have the same power to arrest as Massachusetts police officers. G. L. c. 221, § 70A.[19] The authority to arrest is generally controlled by Massachusetts common law and statutes, which confer the power and also define the limits of that power. Our State law may authorize Massachusetts officers to enforce Federal statutes and make arrests for Federal offenses (unless preempted by Federal law), but it need not do so. Commonwealth v. Craan, 469 Mass. 24, 33 (2014), and cases cited. In the absence of a Federal

---

[19] "Court officers and those authorized to act as court officers within the judicial branch may perform police duties and have police powers in or about the areas of the court to which they have been assigned when so designated by the chief justice of the trial court, the chief justice of the supreme judicial court or the chief justice of the appeals court, as appropriate." G. L. c. 221, § 70A.

statute granting State officers the power to arrest for a Federal offense, their authority to do so is a question of State law.  Id.  See United States v. Di Re, 332 U.S. 581, 589-590 (1948) (authority of State officers to make arrests for Federal crimes is, absent Federal statutory instruction, matter of State law); Gonzales v. Peoria, 722 F.2d 468, 475-476 (9th Cir. 1983), overruled on other grounds, Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (concluding that Arizona officers had authority as matter of State law to enforce criminal provisions of Federal immigration law).  We must therefore carefully examine Massachusetts common law, Massachusetts statutory law, and any Federal statutory law that may possibly give Massachusetts officers the power to arrest in these circumstances.

a.  Massachusetts common law.  Under the common law of Massachusetts, police officers have the authority to make warrantless arrests, but only for criminal offenses, and then only in limited circumstances.  First, an officer has authority to arrest without a warrant any person whom he or she has probable cause to believe has committed a felony.  See Commonwealth v. Gernrich, 476 Mass. 249, 253 (2017); Commonwealth v. Hason, 387 Mass. 169, 173 (1982).  Second, an officer has authority to arrest without a warrant any person who commits a misdemeanor, provided the misdemeanor involves an

actual or imminent breach of the peace, is committed in the officer's presence, and is ongoing at the time of the arrest or only interrupted by the arrest.  See Commonwealth v. Jewett, 471 Mass. 624, 629-630 (2015); Commonwealth v. Howe, 405 Mass. 332, 334 (1989); Muniz v. Mehlman, 327 Mass. 353, 357 (1951); Commonwealth v. Gorman, 288 Mass. 294, 297-299 (1934), and numerous authorities cited.

"Breach of the peace" in this context generally means an act that causes a public disturbance or endangers public safety in some way.  See, e.g., Jewett, 471 Mass. at 629-630 (reckless operation of motor vehicle, including erratic driving on public streets, near-collision with parked vehicle, failure to stop, and chase through residential area, involved breach of peace); Howe, 405 Mass. at 334 (operating motor vehicle while under influence of alcohol); Commonwealth v. Mullins, 31 Mass. App. Ct. 954, 954-955 (1991) (blaring loud music "turned up to full blast" and shouting obscenities from apartment window, thereby disturbing neighbors and resulting in gathering of neighbors outside).  See also Black's Law Dictionary at 189 (6th ed. 1990) (defining "[b]reach of the peace" as "violations of public peace or order and acts tending to a disturbance thereof . . . disorderly, dangerous conduct disrupting of public peace"); 4

C.E. Torcia, Wharton's Criminal Law § 503 (15th ed. 1996).[20]

That is the sum and substance of the power of police officers to make warrantless arrests under Massachusetts common law. Conspicuously absent from our common law is any authority (in the absence of a statute) for police officers to arrest generally for civil matters, let alone authority to arrest

---

[20] The breach of the peace requirement for a misdemeanor arrest has its roots in English common law, see Regina v. Tooley, 2 Ld. Raym. 1296, 1301, 92 Eng. Rep. 349, 352-353 (K.B. 1710), quoted with approval in Commonwealth v. Gorman, 288 Mass. 294, 297 (1934), and has become firmly embedded in the common law of Massachusetts. "Arrest without a warrant for a misdemeanor not amounting to a breach of the peace was impermissible at common law." Commonwealth v. Conway, 2 Mass. App. Ct. 547, 550 (1974). Not only have our cases cited the breach of the peace requirement repeatedly as a correct statement of our common law, but we have also consistently enforced the requirement, when necessary, by holding warrantless misdemeanor arrests that were not authorized by statute and that did not involve any breach of the peace to be unlawful. See, e.g., Commonwealth v. Mekalian, 346 Mass. 496, 497-498 (1963) (misdemeanor offense of registering bets without license did not involve breach of peace; arrest without warrant or statutory authorization was unlawful, resulting in suppression of evidence seized incident to arrest); Commonwealth v. Wright, 158 Mass. 149, 158-159 (1893) (misdemeanor offense of possessing "short lobsters" with intent to sell did not involve breach of peace; arrest without warrant or statutory authorization was unlawful); Commonwealth v. O'Connor, 7 Allen 583, 584-585 (1863) (arrest for drunkenness in private that did not create breach of public peace was unlawful); Commonwealth v. Ubilez, 88 Mass. App. Ct. 814, 820-821 (2016) (misdemeanor offense of operating motor vehicle with revoked or suspended registration, absent evidence of erratic or negligent operation or other danger to public, did not involve breach of peace; arrest without warrant or statutory authorization unlawful). Contrast Atwater v. Lago Vista, 532 U.S. 318, 327-355 (2001) (surveying common law; holding that Fourth Amendment to United States Constitution does not require breach of peace for warrantless misdemeanor arrest).

specifically for Federal civil immigration matters.[21,22]

    b.  <u>Massachusetts statutory law</u>.  Apart from the common

---

[21] The parties and the United States, as amicus curiae, have brought to our attention a change in the standard immigration detainer form that occurred shortly before the oral argument in this case, and the fact that immigration detainers are now accompanied by either Form I-200 or Form I-205.  See note 17, <u>supra</u>.  The latter forms are Federal administrative warrants issued by Federal immigration officials to other Federal immigration officials.  They appear to have no bearing on the question whether Massachusetts officers have authority under Massachusetts law to make civil immigration arrests.  They do not transform the removal process into a criminal process, nor do they change the fact that Massachusetts officers, absent a statute, have no common-law authority to make civil arrests.  Simply stated, the fact that a Federal officer may have the authority under Federal law to take custody of an individual pursuant to one of these forms for removal purposes does not mean that Massachusetts officers have the authority under Massachusetts law to do so.

We note that the Federal government's stated reason for now issuing administrative warrants with civil immigration detainers is to counteract a recent ruling by a Federal District Court judge that, in the absence of a showing of risk of flight, invalidated arrests made by Federal officers pursuant to detainers as impermissible warrantless arrests under the act.  See <u>Moreno</u> v. <u>Napolitano</u>, 213 F. Supp. 3d 999, 1005-1009 & n.2 (N.D. Ill. 2016), quoting 8 U.S.C. § 1357(a)(2) (authorizing Federal immigration officers to arrest without warrant only if, among other things, they have "reason to believe that the alien so arrested . . . is likely to escape before a warrant can be obtained for his arrest").  See also United States Immigration and Customs Enforcement, Policy Number 10074.2:  Issuance of Immigration Detainers by ICE Immigration Officers § 2.4, at 2 n.2 (Mar. 24, 2017).

[22] As we have said, this case concerns detention based solely on a civil immigration detainer.  This was not a situation where a detainer provided an officer with probable cause that a Federal criminal offense had been committed.  We therefore do not address the authority or obligations of Massachusetts officers who, by a detainer or otherwise, acquire information of a Federal criminal offense.

law, the parties and the amici have directed us to numerous and varied Massachusetts statutes that authorize arrests by police officers and other officials, both with and without warrants. See, e.g., G. L. c. 12, § 11J (constitutional and civil rights violations); G. L. c. 41, § 98 (public disturbances and disorder); G. L. c. 90, § 21 (certain motor vehicle offenses); G. L. c. 91, § 58 (misdemeanors committed in or upon certain Massachusetts waterways); G. L. c. 94C, § 41 (controlled substance offenses); G. L. c. 209A, § 6 (7) (domestic violence offenses); G. L. c. 269, § 10 (h) (unlicensed firearm offenses); G. L. c. 276, § 28 (various misdemeanors); G. L. c. 279, § 3 (probation violations).  However, no party or amicus has identified a single Massachusetts statute that authorizes a Massachusetts police officer or court officer, directly or indirectly, to arrest in the circumstances here, based on a Federal civil immigration detainer.  Simply put, there is no such statute in Massachusetts.

The parties and amici have also identified several Massachusetts statutes that authorize the noncriminal detention of individuals in certain circumstances.  See, e.g., G. L. c. 111B, § 8 (protective custody for incapacitated and intoxicated persons); G. L. c. 123, § 12 (emergency hospitalization due to mental illness); G. L. c. 123, § 35 (involuntary commitment of persons with alcohol and substance

abuse disorders); G. L. c. 123A (sexually dangerous persons); G. L. c. 215, §§ 34, 34A (civil contempt for noncompliance with spousal or child support order); G. L. c. 276, §§ 45-49 (material witnesses in criminal proceedings).  Again, however, none of these statutes either directly or indirectly authorizes the detention of individuals based solely on a Federal civil immigration detainer.

c.  Argument of the United States.  The United States, as amicus curiae, asks us to hold that officers in Massachusetts have "inherent authority" to carry out the detention requests made in Federal civil immigration detainers -- essentially, to make arrests for Federal civil immigration matters as a form of cooperation with the Federal authorities.  See, e.g., United States v. Santana-Garcia, 264 F.3d 1188, 1193-1194 (10th Cir. 2001) (State and local police officers have "implicit authority" to investigate and arrest for violations of Federal immigration law, presumably both civil and criminal, absent State or local law to contrary).[23]  But see Gonzales, 722 F.2d at 475 (State law

---

[23] We do not see any meaningful difference between "inherent authority" (the term used by the United States in its brief) and "implicit authority" (the term used by the United States Court of Appeals for the Tenth Circuit).  The term "inherent authority" likely derives from a memorandum of the Department of Justice's Office of Legal Counsel, dated April 3, 2002, which espoused the theory in that way.  The 2002 memorandum essentially reversed course from a 1996 opinion of the Office of Legal Counsel, which had reflected the Department of Justice's historical view that, absent express authorization, State and

must affirmatively grant authority to State and local officers to enforce Federal immigration law before arrest can be made on that basis).

"The assertion that [S]tate and local officials have inherent civil enforcement authority has been strongly contested in the academy, in police departments, and in the courts" (footnotes omitted). Armacost, "Sanctuary" Laws: The New Immigration Federalism, 2016 Mich. L. Rev. 1197, 1211 (Armacost). Moreover, it is questionable whether a theory of "inherent" or "implicit" State authority continues to be viable in the immigration context after the United States Supreme Court's decision in Arizona, supra, which severely curtailed, on Federal preemption grounds, the power of State and local police to act in Federal immigration matters. See I.J. Kurzban, Immigration Law Sourcebook 425 (15th ed. 2016) ("The notion of 'inherent authority' to arrest and detain undocumented persons . . . has been seriously undermined" by Supreme Court's holding); Armacost, supra at 1211-1215 (arguing that inherent authority theory has been foreclosed by Supreme Court's decision). Assuming that the theory remains viable, and has not

---

local police lack authority to arrest or detain aliens solely for purposes of civil immigration proceedings. See Armacost, "Sanctuary" Laws: The New Immigration Federalism, 2016 Mich. L. Rev. 1197, 1210-1211; Lewis, Gass, von Briesen, Master, & Wishnie, Authority of State and Local Officers to Arrest Aliens Suspected of Civil Infractions of Federal Immigration Law, 7 Bender's Immigr. Bull. 944, 944-945 (Aug. 1, 2002).

been foreclosed by the Supreme Court's decision in <u>Arizona</u>, a point of Federal law that we need not decide, we nevertheless decline to adopt it as a matter of Massachusetts law as a basis for authorizing civil immigration arrests.

As we have said, the common law and the statutes of this Commonwealth are what establish and limit the power of Massachusetts officers to arrest.  There is no history of "implicit" or "inherent" arrest authority having been recognized in Massachusetts that is greater than what is recognized by our common law and the enactments of our Legislature.  Where neither our common law nor any of our statutes recognizes the power to arrest for Federal civil immigration offenses, we should be chary about reading our law's silence as a basis for affirmatively recognizing a new power to arrest -- without the protections afforded to other arrestees under Massachusetts law[24] -- under the amorphous rubric of "implicit" or "inherent" authority.  Recognizing a new common-law power to effect a Federal civil immigration arrest would also create an anomaly in our common law:  a State or local police officer in Massachusetts (or, as in this case, a court officer) would be

---

[24] Among other things, an individual arrested without a warrant in Massachusetts has a statutory right to be considered for bail and, if not admitted to bail, a constitutional right to a prompt determination of probable cause to arrest, made by a neutral magistrate, generally within twenty-four hours of arrest.  See <u>Jenkins</u> v. <u>Chief Justice of the Dist. Court Dep't</u>, 416 Mass. 221, 238-245 (1993).

able to effect a warrantless arrest for a criminal misdemeanor only if it involves a breach of the peace (see part 5.a, supra), but would be able to arrest for a Federal civil matter without any such limitation; in other words, the officer would have greater authority to arrest for a Federal civil matter than for a State criminal offense.  See generally Bach, State Law to the Contrary?  Examining Potential Limits on the Authority of State and Local Law Enforcement to Enforce Federal Immigration Law, 22 Temp. Pol. & Civ. Rts. L. Rev. 67 (2012).

The prudent course is not for this court to create, and attempt to define, some new authority for court officers to arrest that heretofore has been unrecognized and undefined.  The better course is for us to defer to the Legislature to establish and carefully define that authority if the Legislature wishes that to be the law of this Commonwealth.[25]

The United States, as amicus, also points to 8 U.S.C. § 1357(g)(10) for the proposition that State officers may cooperate with Federal immigration authorities by detaining and arresting pursuant to an immigration warrant.  To understand what § 1357(g)(10) accomplishes, it is necessary to consider § 1357(g) as a whole.

---

[25] We express no view on the constitutionality of any such statute, or whether such a statute would be preempted by Federal law.  It would be premature for us to rule on those questions unless and until a specific statute is enacted.

Section 1357(g) generally concerns situations in which State and local officers can perform functions of a Federal immigration officer.  Section 1357(g)(1) provides specifically that States and their political subdivisions may enter into written agreements with the Federal government that allow State or local officers to perform functions of an immigration officer "at the expense of the State or political subdivision and to the extent consistent with State and local law."  Such agreements are commonly referred to as "287(g) agreements," referring to the section of the act that authorizes them, § 287(g), which is codified in 8 U.S.C. § 1357(g).  Among other things, State and local officers performing Federal functions under such agreements must be trained in the enforcement of Federal immigration laws, must adhere to the Federal laws, may use Federal property and facilities to carry out their functions, and are subject to the supervision and direction of the United States Attorney General.  8 U.S.C. § 1357(g)(2)-(5).  No State or political subdivision is required to enter into such an agreement.  See 8 U.S.C. § 1357(g)(9).[26]

The specific language relied on by the United States in this case is the final paragraph of § 1357(g), which provides:

---

[26] This case does not involve such a written agreement.  We therefore express no view whether the detention of an individual pursuant to a Federal civil immigration detainer by a Massachusetts officer who is operating under such an agreement would be lawful.

   "(10) Nothing in this subsection shall be
   construed to require an agreement under this
   subsection in order for any officer or employee of a
   State or political subdivision of a State . . . (A) to
   communicate with the Attorney General regarding the
   immigration status of any individual, including
   reporting knowledge that a particular alien is not
   lawfully present in the United States; or (B)
   otherwise to cooperate with the Attorney General in
   the identification, apprehension, detention, or
   removal of aliens not lawfully present in the United
   States."

Significantly, the United States does not contend that

§ 1357(g)(10) affirmatively confers authority on State and local

officers to make arrests pursuant to civil immigration

detainers, where none otherwise exists.  See Craan, 469 Mass. at

33 (recognizing that Federal statute may confer authority on

State officers to arrest for Federal offenses).  See also Di Re,

332 U.S. at 589-590.  In other words, it does not claim that

§ 1357(g)(10) is an independent source of authority for State or

local officers to make such an arrest.  Rather, it cites

§ 1357(g)(10) as a part of its argument that State and local

officers have inherent authority to make these kinds of arrests;

specifically, it relies on this provision for the proposition

that such arrests, when performed at the request of the Federal

government, are a permissible form of State participation in the

Federal immigration arena that would not be preempted by Federal

law.  We have already rejected the argument that Massachusetts

officers have an inherent authority to arrest that exceeds what

is conferred on them by our common law and statutes.

Further, it is not reasonable to interpret § 1357(g)(10) as affirmatively granting authority to all State and local officers to make arrests that are not otherwise authorized by State law. Section 1357(g)(10), read in the context of § 1357(g) as a whole, simply makes clear that State and local authorities, even without a 287(g) agreement that would allow their officers to perform the functions of immigration officers, may continue to cooperate with Federal immigration officers in immigration enforcement to the extent they are authorized to do so by their State law and choose to do so.[27]

---

[27] Nothing in the legislative history of 8 U.S.C. § 1357(g) or the department's very thorough "Guidance on State and Local Governments' Assistance in Immigration Enforcement and Related Matters" (accessible at https://dhs.gov/xlibrary/assets /guidance-state-local-assistance-immigration-enforcement.pdf [https://perma.cc/S7UA-6S4E]), suggests that § 1357(g)(10) constitutes an affirmative grant of immigration arrest authority to States.

The United States cites three cases that mention § 1357(g)(10), but none of them resolves the exact question presented here, which is whether the statute confers authority on State officers to arrest on a Federal civil immigration detainer even where State law does not authorize such an arrest. Those cases principally addressed whether the actions of State officers were done in cooperation with Federal officers, or unilaterally such that they would be preempted by Federal law. Those courts were not asked to decide whether State officers are independently authorized by § 1357(g)(10) to do acts, in the name of "cooperation," that they are not authorized to do under State law.  See United States v. Ovando-Garzo, 752 F.3d 1161, 1163-1164 (8th Cir. 2014) (holding that North Dakota highway patrol trooper who detained suspect at request of United States Border Patrol agent acted cooperatively pursuant to

In those limited instances where the act affirmatively grants authority to State and local officers to arrest, it does so in more explicit terms than those in § 1357(g)(10). See, e.g., 8 U.S.C. § 1103(a)(10) (permitting Attorney General to authorize State and local officers, with consent of their department or agency, to perform all powers and duties of immigration officers in emergency cases of "actual or imminent mass influx of aliens off the coast of the United States, or near a land border"); id. at § 1252c (authorizing State and local officers, "to the extent permitted by State and local law," to arrest and detain convicted felons who have been previously deported but are presently in country illegally); id.

---

§ 1357[g][10], not unilaterally, and thus did not exceed scope of authority so as to trigger preemption; no issue whether officer's actions were authorized by North Dakota law); Santos v. Frederick County Bd. of Comm'rs, 725 F.3d 451, 465-466 (4th Cir. 2013), cert. denied, 134 S. Ct. 1541 (2014) (holding that detention by State deputy sheriffs before confirmation that immigration warrant was active was not cooperation for purposes of § 1357[g][10], thereby triggering preemption, because arrest was not made pursuant to Federal direction; no issue whether detention was authorized by Maryland law); United States v. Quintana, 623 F.3d 1237 (8th Cir. 2010) (noting in single sentence that North Dakota highway patrol trooper who stopped defendant for traffic violation was authorized by § 1357[g][10] to assist Federal agent in arresting detainee; no issue whether detention was authorized under State law).

We have also considered other cases that mention § 1357(g)(10). None of them addresses the specific question we have here, i.e., whether the statute independently and affirmatively confers authority on State officers to arrest on immigration detainers where such an arrest is not authorized by State law.

at § 1324(c) (authorizing arrest, by designated immigration officers "and all other officers whose duty it is to enforce criminal laws," of persons who commit criminal offense of illegally bringing in, transporting, or harboring aliens); id. at § 1357(g)(1)-(9) (authorizing State and local officers trained pursuant to written agreements with Federal government to perform duties of immigration officers).

Conclusion.  The case is remanded to the county court for entry of a judgment stating that Lunn's case is dismissed as moot, and declaring that Massachusetts law provides no authority for Massachusetts court officers to arrest and hold an individual solely on the basis of a Federal civil immigration detainer, beyond the time that the individual would otherwise be entitled to be released from State custody.

So ordered.