People ex rel. Wells v DeMarco (2018 NY Slip Op 07740)





People ex rel. Wells v DeMarco


2018 NY Slip Op 07740


Decided on November 14, 2018


Appellate Division, Second Department


Scheinkman, P.J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on November 14, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department










SCHEINKMAN, P.J.

2017-12806 OPINION & JUDGMENT
[*1]The People of the State of New York, ex rel. Jordan Wells, on behalf
of Susai Francis, petitioner, v
Vincent F. DeMarco,
etc., respondent.

WRIT OF HABEAS CORPUS in the nature of an application to release Susai
Francis from the custody of the Sheriff of Suffolk County.
New York Civil Liberties Union Foundation, New York, NY (Jordan Wells, Paige Austin, Mariana Kovel, Christopher Dunn, and Scout Katovich of counsel), and American Civil Liberties Union Foundation, New York, NY (Omar C. Jadwat, Cody Wofsy, and Spencer Amdur of counsel), for petitioner.
Dennis M. Brown, County Attorney, Hauppauge, NY (Leonard G. Kapsalis of counsel), for respondent.
Matthew G. Whitaker, Acting Attorney General of the United States, Washington, DC (Richard P. Donoghue, Joseph A. Marutollo, Chad A. Readler, William C. Peachey, Erez Reuveni, and Steven A. Platt of counsel), for amicus curiae United States of America.
Barbara D. Underwood, Attorney General, New York, NY (Anisha S. Dasgupta and Scott A. Eisman of counsel), amicus curiae pro se.
Morningside Heights Legal Services, Inc., New York, NY (Elora Mukherjee, National Immigrant Justice Center [Mark Fleming and Katherine Melloy Goettel], pro se, and Christopher N. Lasch, pro se, of counsel), for amici curiae National Immigrant Justice Center, David Baluarte, Eduardo R.C. Capulong, Michael J. Churgin, Kate Evans, César Cuauhtémoc García Hernández, Denise Gilman, Tanya Maria Golash-Boza, Geoffrey A. Hoffman, Alan Hyde, Ulysses Jaen, Ramzi Kassem, Elizabeth Keyes, Ira J. Kurzban, Annie Lai, Christopher N. Lasch, Beth Lyon, M. Isabel Medina, Vanessa Merton, Jason Parkin, Huyen Pham, Karen Pita Loor, William P. Quigley, Sarah Rogerson, Victor Romero, Rubén G. Rumbaut, Erica B. Schommer, Christian Sundquist, Maureen A. Sweeney, David B. Thronson, Mary Pat Treuthart, Yolanda Vázquez, Robin Walker Sterling, Richard A. Wilson, Stephen Wizner, and Mark E. Wojcik.SCHEINKMAN, P.J.
The issue before us in this proceeding is both narrow and important. We must decide whether New York law permits New York state and local law enforcement officers to effectuate civil immigration arrests. The authority of federal civil immigration officers to effectuate such arrests is not before us. Nor do we have occasion to pass upon broad issues of immigration law and policy. Addressing only the precise question before us, and based on our [*2]analysis of the relevant statutes and precedents, we conclude that New York state and local law enforcement officers are not authorized by New York law to effectuate arrests for civil law immigration violations.
The Relevant Facts
The facts are undisputed. Susai Francis is a citizen of India. He entered the United States in New York, New York, in 1996, under the terms of a B2 visitor visa, which allowed him to remain in the United States for a period not to exceed six months. Francis failed to depart the United States as required by the visa. He resided on Long Island for more than two decades and has two children, one of whom is a citizen of the United States. On March 25, 2015, Francis was served with a notice to appear in Immigration Court, and he is currently the subject of removal proceedings.
On November 28, 2016, Francis was charged in Suffolk County with misdemeanor criminal contempt in the second degree (Penal Law § 215.50) for violation of a Family Court order of protection. He was released on his own recognizance. Francis was arrested again on June 14, 2017, this time in Nassau County, on two misdemeanor counts: operating a motor vehicle while under the influence of alcohol (see Vehicle and Traffic Law § 1192) and driving an uninsured vehicle (see Vehicle and Traffic Law § 319). Francis was held at the Nassau County Correctional Center.
As part of the procedure followed by the Nassau County Police Department, upon Francis's arrest, his fingerprints were taken and submitted to federal databases. He was identified as an Indian citizen who was unlawfully present in the United States. United States Immigration and Customs Enforcement (hereinafter ICE) Deportation Officer Julissa Iniguez issued both a detainer and an arrest warrant, which were provided to the Nassau County Police Department. The detainer, addressed to the Nassau County Police Department, requested that the Police Department notify ICE as soon as practicable before Francis was released from custody, on at least 48 hours' notice, if possible. The warrant, addressed to any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act (8 USC §§ 1226, 1357) and 8 CFR part 287 to serve warrants of arrest for immigration violations, commanded that Francis be arrested and taken into custody for the purposes of removal proceedings.
On December 4, 2017, Francis pleaded guilty in Nassau County District Court to one count of misdemeanor operating a motor vehicle while under the influence of alcohol (see Vehicle and Traffic Law § 1192[2-a][a]). He was then transferred from the Nassau County Correctional Center to the Suffolk County Correctional Facility in Riverhead (hereinafter the Riverhead facility), which is operated by the Sheriff of Suffolk County, for completion of proceedings on the Suffolk County criminal charge. The ICE detainer and arrest warrant were transferred along with him.
On December 11, 2017, Francis pleaded guilty in Suffolk County District Court to one count of disorderly conduct. He was sentenced to time served. However, Francis was not released from custody and was, instead, returned to the Riverhead facility.
In September 2014, the Sheriff of Suffolk County (hereinafter the Sheriff) established a policy that an inmate was not to be held in custody solely on the basis of an ICE detainer. Instead, an inmate subject to an ICE detainer would be sent to court and, in the event that all local charges were disposed of, the inmate would not be returned to the correctional facility. The inmate would be free to leave on his or her own directly from the courthouse, just as inmates who are not subject to ICE detainers are treated. However, on December 2, 2016, the Sheriff issued a new policy under which inmates subject to either an ICE detainer accompanied by a United States Department of Homeland Security (hereinafter DHS) Warrant for Arrest of Alien, and/or DHS Warrant of Removal/Deportation, are to be held for up to 48 hours after the time they would otherwise have been released, with ICE to be notified immediately. Under the 2016 policy, when an inmate is subject to an ICE detainer and warrant, the inmate is retained at a Suffolk County correctional facility by the Sheriff but the paperwork is "re-written" to reflect that the inmate is in federal custody. Once the paperwork is "re-written," the Sheriff's Office regards the inmate as being in the custody of ICE and places the inmate in jail cells at the Riverhead facility that are rented by ICE from the Sheriff.
Francis's case was handled in accordance with the revised policy. Following the conclusion of his court proceeding, at which he was sentenced to time served, he was handcuffed and taken to a courthouse holding cell by members of the Sheriff's Office and was thereafter returned to the Riverhead facility. Upon his return to the Riverhead facility, Francis's paperwork was "re-written" from being an "adult male misdemeanor" case to be being an "adult male warrant" case [*3]based on the ICE warrant, and Francis was regarded by the Sheriff as being in the custody of ICE. Francis was placed in a jail cell rented by ICE.
The present habeas corpus proceeding was commenced on Francis's behalf by Jordan Wells, an attorney with the New York Civil Liberties Union Foundation. An order to show cause was signed by a Justice of this Court on December 11, 2017, the day that Francis was detained notwithstanding the termination of the state criminal action against him. Oral argument was held the following day before a panel of this Court.[FN1]
On December 13, 2017, ICE agents retrieved Francis from the Riverhead facility and transferred him to a long-term ICE detention facility. This Court invited the parties to file supplemental pleadings and briefs. This Court also invited the New York State Attorney General and the United States Department of Justice to submit memoranda as amici curiae. As of January 5, 2018, Francis was being held by ICE at the Bergen County Jail in Hackensack, New Jersey, pending removal proceedings in Immigration Court. The Mootness Exception
The verified petition, dated December 11, 2017, requested the immediate release of Francis and a declaration that his detention was unlawful and in excess of the Sheriff's arrest authority. In a supplemental petition, filed after Francis was transferred from the Sheriff's custody, the petitioner requested that this Court apply the exception to the mootness doctrine and find Francis's arrest by the Sheriff to be unlawful. In support of this request, the petitioner asserts that ICE directs hundreds of detainer requests to the Sheriff annually, with some 405 requests being presented in just the first 10 months of the 2017 fiscal year. The petitioner points out that the Nassau County Sheriff has a policy similar to that followed in Suffolk County [FN2] and that ICE also directs hundreds of detainer requests to the Nassau County Sheriff each year. According to the petitioner, 379 requests were made by ICE to the Nassau County Sheriff in the first 10 months of the 2017 fiscal year. The Sheriff has not advanced any argument in opposition to the petitioner's request that we invoke the exception to the mootness doctrine and reach the merits. Likewise, none of the amici suggest that we treat the controversy as moot.
"It is a fundamental principle of our jurisprudence that the power of a court to declare the law only arises out of, and is limited to, determining the rights of persons which are actually controverted in a particular case pending before the tribunal" (Matter of Hearst Corp. v Clyne, 50 NY2d 707, 713). "Courts are generally prohibited from issuing advisory opinions or ruling on hypothetical inquiries. Thus, [a proceeding] is moot unless an adjudication of the merits will result in immediate and practical consequences to the parties" (Coleman v Daines, 19 NY3d 1087, 1090 [citation omitted]; see Matter of New York State Commn. on Jud. Conduct v Rubenstein, 23 NY3d 570, 576; Matter of Hearst Corp. v Clyne, 50 NY2d at 714). Here, of course, with Francis now being indisputably in the custody of ICE, and being lodged in a facility located out of the state, an adjudication of the merits will not have any practical, much less immediate, consequence to him. Consequently, the proceeding is moot (see People ex rel. Warren v People, 171 AD2d 768, 768). However, that does not end the matter.
Even where a proceeding is moot, judicial review is permitted where the issue to be decided (1) is likely to reoccur, either between the parties or other members of the public, (2) will typically evade review in the courts, and (3) is substantial or novel (see Coleman v Daines, 19 NY3d at 1090; City of New York v Maul, 14 NY3d 499, 507; Matter of Hearst Corp. v Clyne, 50 NY2d at 714-715).
It is evident that this issue is likely to reoccur. As the petitioner points out, and the Sheriff does not refute, nearly 800 detainers were submitted by ICE to the Nassau and Suffolk County Sheriff's offices during 2017. The statistics presented by the petitioner indicate that the [*4]number of ICE detainers has increased substantially over the years, suggesting a continuing pattern of growth. While it is not known whether any counties within the Second Judicial Department (or even outside it) other than Suffolk and Nassau have policies similar to the one at issue here, it is readily apparent that hundreds of inmates in just two counties within this Department may well face the application of the policy each year.
The issue is also aptly characterized as ephemeral in nature. Courts will likely never be able to provide full and meaningful review to any inmate prior to his or her being released or transferred from the custody of the Sheriff. Under the terms of the detainer itself, the local authorities are requested to hold a subject inmate for up to 48 hours and, here, the Sheriff's policy is to hold the subject inmates for up to 48 hours after they would have otherwise been released. It would be most unlikely that any habeas corpus proceeding could be commenced in this Court, served, briefed, argued, considered, and decided within a 48-hour period. Any attempt to do so would necessarily entail rendering a determination without appropriate time for briefing and deliberation and, at best, any determination would be issued only after much, if not all, of the 48-hour period had expired, during which the inmate will have been detained against his or her will. In the same vein, where a detainee seeks relief in the Supreme Court and the determination is adverse to the detainee, the press of time may preclude an effective appellate remedy [FN3]. And, if the Supreme Court were to grant relief to a detainee, that determination would not be subjected to appellate review unless the Sheriff decided to pursue an appeal.
The underlying controversy persists, and is not moot, since the Sheriff, supported by the United States Department of Justice, maintains that the policy is lawful, while the petitioner, supported by the New York State Attorney General, the National Immigrant Justice Center, and a coalition of law professors, maintains that it is not. The validity of the policy may be tested in damages actions (see Castaneda v County of Suffolk, 60 Misc 3d 1201[A], 2018 NY Slip Op 50894[U] [Sup Ct, Suffolk County]), but it would be in the interest of both the detainees and the taxpayers to determine the lawfulness of civil immigrant arrests by state and local law enforcement officials before damage, and any further liability, is incurred.
The issues presented are both novel and significant. Arrest and detention are deprivations of freedom. Where an individual in a state or local correctional facility continues to be held against his or her will despite having served a sentence, it is important, if not vital, if our rule of law is to mean anything, that a court determine whether the continued detention is lawful. It is important as well for the Sheriff to have the benefit of a ruling on the merits so that his conduct may be guided accordingly. There is no New York appellate decision addressing these issues.
Accordingly, a determination on the merits of the arguments presented is warranted.
Detention Pursuant to an ICE Detainer or Warrant Constitutes
an Arrest
New York state and federal law mirror each other regarding what constitutes an arrest (see Florida v Royer, 460 US 491, 502 [a showing of official authority such that "a reasonable person would have believed he was not free to leave" indicates that an arrest has occurred under the Fourth Amendment of the United State Constitution (internal quotation marks omitted)]; People v Yukl, 25 NY2d 585, 589 [a suspect is in custody when a reasonable person innocent of any crime would not have believed he or she was free to leave the presence of the police]). With respect to immigration detainers, the federal courts have held that a continued detention on that basis after an inmate is entitled to release constitutes a new arrest (see Morales v Chadbourne, 793 F3d 208, 217 [1st Cir] [since an individual was "kept in custody for a new purpose after she was entitled to release, she was subjected to a new seizure for Fourth Amendment purposes—one that must be supported by a new probable cause justification"]; Moreno v Napolitano, 213 F Supp 3d 999, 1005 [ND Ill] [federal government conceded that detention of an individual pursuant to an ICE detainer constitutes an arrest]).
Here, Francis was entitled to release after being sentenced to time served on his state charges and, but for the ICE detainer and arrest warrant, would have been discharged from custody directly from the courthouse. When he was retained in custody and returned to the Riverhead facility for further detention and subsequently "re-written" as "adult male warrant," he was subjected to a [*5]new arrest and seizure under both New York law and the Fourth Amendment of the United States Constitution.
The ICE Detainer and Warrant Are Civil in Nature
"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens" (Arizona v United States, 567 US 387, 394; see Toll v Moreno, 458 US 1, 10). The principal statute governing immigration in the United States is the Immigration and Nationality Act (see 8 USC § 1101 et seq.). The Act sets forth terms, conditions, and procedures for removing aliens from the country (see id.). While some violations of the Act are criminal offenses,[FN4] "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States" (Arizona v United States, 567 US at 407). Illegal presence in the country, standing alone, is not a crime (see Melendres v Arpaio, 695 F3d 990, 1000-1001 [9th Cir]); it is a civil violation that subjects the individual to removal (see 8 USC § 1227[a][1][B]). The federal process for removing someone from the country is a civil administrative matter, not a criminal one (see Arizona v United States, 567 US at 396).
ICE, an agency within the DHS, "conducts criminal investigations involving the enforcement of immigration-related statutes" (id. at 397 [internal quotation marks omitted]). "ICE officers are responsible for the identification, apprehension, and removal of illegal aliens from the United States" (id. [internal quotation marks omitted]).
ICE officers may arrest an alien pursuant to an administrative arrest warrant "pending a decision on whether the alien is to be removed from the United States" (8 USC § 1226[a]) or when an alien has already been adjudicated removable (see 8 USC §§ 1226[c][1]; 1231[a][2]; 8 CFR 241.2[a][1] [aliens convicted of certain crimes shall be taken into custody upon release from the sentence for that crime]). The warrants are executed by federal officers who have received training in the enforcement of immigration law (see 8 CFR 287.5[e][3]; 241.2[b]). When no arrest warrant has been issued, an immigration officer's authority is limited such that an arrest will only be valid where there is "reason to believe" the alien is in violation of an immigration law or regulation and "is likely to escape before a warrant can be obtained" (8 USC § 1357[a][2]).
Here, the arrest warrant for Francis was directed, not to any state or local law enforcement official, but to immigration officers authorized by federal law. The warrant reflects the determination by ICE Deportation Officer Iniguez that probable cause existed to believe that Francis was removable from the United States. The command for Francis's arrest was made by the ICE officer.
Although administrative arrest warrants are constitutionally valid in the federal immigration law enforcement context, such warrants are civil and administrative, and not judicial, in nature (see Abel v United States, 362 US 217, 234, 236).
An ICE detainer is a written request to state or local officials regarding a removable alien in their custody, asking them (1) to notify the DHS as soon as practicable before an alien is released; and (2) to maintain custody of the alien for up to 48 hours beyond the preexisting release date so that the DHS may assume custody (see City of El Cenizo, Texas v Texas, 890 F3d 164, 174 [5th Cir]; U.S. Immigration and Customs Enforcement, Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers [Mar. 24, 2017], available at https://perma.cc/T6FJ-FXL3 [last accessed Nov. 13, 2018]). As of April 2017, ICE makes this request using Form I-247A, which must be accompanied by an administrative warrant for arrest (or removal if the individual has already been adjudicated) signed by an immigration officer (Form I-200) (see 8 USC §§ 1226, 1231[a]; 8 CFR 236.1). Form I-247A states that the DHS has determined that there is probable cause that the subject of the request is a removable alien, and ICE officers check one of four boxes on the form to indicate the basis for probable cause.
One of the check boxes—the one checked in the detainer issued to the Nassau County Police Department in reference to Francis—indicates that the probable cause finding is based upon:
"Biometric confirmation of the alien's identity and a records check . . . that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law."
A detainer is not a stand-alone document. It must be accompanied by an administrative arrest warrant. But, even if viewed as a stand-alone document, the detainer does not convey any authority or command to actually detain anyone. It merely requests continued detention of one already detained.
The ICE arrest warrant and detainer were the basis for Francis's continued detention by the Sheriff at the Riverhead facility notwithstanding that Francis had completed his sentence on the state criminal charges.
New York Statutory Law Does Not Authorize State and Local
Law
Enforcement Officers to Effectuate Arrests Pursuant to
ICE Administrative Detainers and Arrest Warrants
New York statutory law recognizes three types of warrants which are used for the purpose of bringing a defendant before a court of this State for the prosecution of a criminal action pending there: (1) a "warrant of arrest" (CPL 120.10); (2) a "superior court warrant of arrest" (CPL 210.10); and (3) a "bench warrant" (CPL 530.70). Each of these warrants is issued in the context of a criminal, not civil, action, and each of these warrants is issued by a court. The ICE warrant of arrest does not fall within any of the definitions of warrants in the Criminal Procedure Law.
There are circumstances where New York statutes authorize the issuance of warrants of arrest in civil matters. Critically, however, in all of these situations the issuing authority is a judicial or quasi-judicial officer of the court (see Family Ct Act §§ 428, 526 [warrants of arrest may be issued by Family Court in support and paternity proceedings]; CPLR 5250 [a court may issue a warrant where a judgment debtor absconds with property of a creditor], 2308 [a court may issue an arrest warrant for failure to comply with a subpoena]; Judiciary Law § 772 [a court may issue an arrest warrant upon contempt punishment]; Mental Hygiene Law § 9.43 [a court may issue a warrant where a mentally ill individual poses a risk of serious harm to himself or others]).
The Executive Law allows for parole violation arrest warrants to be issued by a member of the parole board or its designee where a parole officer reports there is reasonable cause to believe an individual's terms of parole have been violated (see Executive Law § 259-i[3][a][i]). While this procedure may be viewed as being akin to the use of administrative warrants by ICE, there is a significant distinction. Parolees, unlike Francis and other similarly removable aliens, have been convicted and sentenced for committed crimes. Parole is not freedom—parolees have been sentenced to imprisonment but allowed to serve a portion of their sentence outside prison walls. Given the unique status of parolees, an administrative warrant for the re-taking of a parolee is not an arrest for Fourth Amendment purposes (see United States v Polito, 583 F2d 48, 55-56 [2d Cir] [a local police officer, acting pursuant to federal parole warrant, may detain a person for the time necessary to contact federal officials and effect the transfer of the person into federal custody so that the warrant may be properly executed]).
Since the administrative warrant issued by ICE was not issued by a judge or a court, the Sheriff lacked New York statutory authority to effectuate an arrest pursuant to the ICE warrant.
New York statutes do not authorize state and local law enforcement to effectuate warrantless arrests for civil immigration law violations. An arrest without a warrant is permitted where an individual "has committed or is believed to have committed an offense and who is at liberty within the state" under certain circumstances prescribed by statute (CPL 140.05). County sheriffs and their deputies are police officers (see CPL 1.20[34]), as are members of the state police, county police, and municipal police.
The Sheriff, under-Sheriffs, and deputy sheriffs of Suffolk County are police officers (see CPL 1.20[34][b]). Warrantless arrests effectuated by a police officer are governed by CPL 140.10, which states in part:
"1. Subject to the provisions of subdivision two, a police officer may arrest a person for:
"(a) Any offense when he or she has reasonable cause to believe that such person has committed such offense in his or her presence; and
"(b) A crime when he or she has reasonable cause to believe that such person has [*6]committed such crime, whether in his or her presence or otherwise."[FN5]
An "offense" is defined as "conduct for which a sentence to a term of imprisonment or to a fine is provided by any law of this state or by any law, local law or ordinance of a political subdivision of this state" (Penal Law § 10.00[1]). A crime is a misdemeanor or a felony (see Penal Law § 10.00[6]). New York state and local police officers may also make warrantless arrests for federal offenses (see United States v Polito, 583 F2d at 51; United States v Swarovksi, 557 F2d 40, 47 [2d Cir]).
Immigration violations, as considered in the matter sub judice, are not crimes but rather are civil matters (see Arizona v United States, 567 US at 396; People v Cesar, 131 AD3d 223, 229). Removable aliens are subject to deportation, not a term of imprisonment or fine, so the provisions regarding warrantless arrests under the Criminal Procedure Law do not apply. Because the members of the Sheriff's office who arrested Francis did not claim that he committed any offense or crime, state or federal, they lacked the authority under the New York statutes to arrest him without a warrant. The result would, of course, be different if the warrantless arrest was on account of a crime or offense on the basis set forth in CPL 140.10.
Arrests for Civil Immigration Violations May Not
Be Justified by Resort to Residual Police Power
The Sheriff and the United States Department of Justice contend that, even if New York state and local law enforcement officers are not statutorily authorized to execute federal immigration arrest warrants, such arrests are nevertheless permissible under the broad state police powers recognized at common law, there being no New York statute that prohibits such arrests. The Sheriff and the Department of Justice posit that the statutes adopted by the New York State Legislature regulating arrest authority are best viewed as supplementing residual common-law authority and not supplanting it. In their view, to limit police powers, there would have to be explicit legislation, and, in any event, New York law permits arrests for federal offenses. As such, they contend that local law enforcement has inherent authority to cooperate with ICE detainers, while the Lunn case (see Lunn v Commonwealth, 477 Mass 517, 78 NE3d 1143) represents a minority view and is only based upon Massachusetts law. Furthermore, they contend that arrests based on detainers do not violate the Fourth Amendment and therefore would not violate the New York Constitution provision that mirrors it. As such, local law enforcement may rely upon the fellow officer rule by acquiring the necessary probable cause for a lawful arrest from ICE officers. We disagree.
We recognize the long-established authority for the broad view of the police power of the individual states by which the states may exercise "the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people" (Manigault v Springs, 199 US 473, 480). The breadth of such power may be said to be unlimited where it has not been "surrendered or restrained" by the United States Constitution (Mayor of New York v Miln, 36 US 102, 139) or by the New York State Constitution (see NY Const art IX). But while it may be acknowledged that New York possesses broad reserved police powers, it does not follow that the existence of such powers supports civil immigration arrests by state and local law enforcement.
New York courts have consistently looked to statutory law in determining arrest authority. In People v Williams (4 NY3d 535, 538), the defendant was arrested for drug possession after being stopped by peace officers for failing to wear a seatbelt. The officers had been assigned to a housing project adjacent to the roadway where the defendant was stopped (see id. at 537). In concluding that the peace officers lacked authority to make the arrest and thus affirming dismissal of the charges, the Court of Appeals relied directly on CPL article 140 for the distinctions between a peace officer's authority and a citizen's arrest (see id. at 538). The Court held that the peace officers could not rely on the greater authority permitted in a citizen's arrest when they were clearly acting in their role as peace officers (see id.). Allowing such reliance would "render these purposefully drawn differences—and the plain language chosen by the Legislature—meaningless" (id.).
The New York cases demonstrate that, in New York,[FN6] arrest authority is predicated on statutory law which has, for the most part, codified the traditional common-law varieties of arrests (see Matter of Victor M., 9 NY3d 84, 87 [a warrantless arrest of a juvenile for a violation is not authorized by Family Court Act § 305.2(2), which only permits warrantless arrests where an adult would be charged with a crime for the same conduct]; People v Bratton, 8 NY3d 637, 643 [finding no authority under Executive Law § 259 or CPL 140.25 for parole officers to conduct warrantless arrests of parolees for parole violations]; People v Miranda-Hernandez, 106 AD3d 838, 839 [a warrantless arrest based upon an out-of-state violation of probation warrant was not authorized, as the officer was obliged to obtain a warrant under CPL 570.32]). We decline, in the context of this case, to intrude upon a carefully crafted, comprehensive, and balanced legislative determination as to the proper scope of the police power to effectuate arrests through the judicial establishment of authority in state and local law enforcement to arrest for what are civil law violations. In this regard, we are mindful that the general New York provision for arrest as a civil law provisional remedy was repealed nearly 40 years ago (see L 1979, ch 409 [eff June 29, 1979, repealing CPLR art 61]; Engel v CBS, Inc., 93 NY2d 195, 204-205).
We therefore conclude that the effecting of arrests by state and local law enforcement acting under ICE administrative arrest warrants may not be supported by resort to common law pertaining to the police power.
March v United States (29 F2d 172 [2d Cir]), relied upon by the Sheriff, does not support the view espoused by the Sheriff. In that case, the Second Circuit did not rely upon a broad, all-encompassing view of New York common law in concluding that a state trooper had authority to make a warrantless arrest for a misdemeanor violation of the federal alcohol prohibition law. The Second Circuit concluded that the then-applicable New York statute, which authorized warrantless arrests for crimes, should be construed as authorizing warrantless arrests for federal misdemeanors. Likewise, the Sheriff's reliance upon United States v Santana-Garcia (264 F3d 1188, 1191 [10th Cir]) is misplaced. That case considered a vehicle stop, search, and arrest of an alien by Utah State Troopers where drugs were found (see id. at 1190-1191). While the court ruled that state law enforcement officers within the Tenth Circuit have general authority to make arrests for violations of federal immigration law, the court also noted that the Utah statute granted "expansive" power to make warrantless arrests for "any public offense" (id. at 1194 n 8 [internal quotation marks omitted]). The court also ruled that it would construe the Utah statute as authorizing warrantless arrests for federal immigration violations at least until the Utah courts ruled otherwise (see id.). Further, the stop in question was prompted by the driver having disobeyed a traffic sign; an ensuing search of the vehicle, which was consented to, resulted in the police finding packages of drugs. The court concluded that the arrest was justified on the basis of both violations of state traffic law and federal immigration law. Here, in contrast, there is no contention that any state laws were violated, and the New York warrantless arrest statute is much narrower than Utah's.
We perceive that the New York State Legislature could, if it thought it desirable, convey to state and local law enforcement the authority to effectuate arrests for federal immigration law violations. However, it is not for us to make that policy determination (see Lunn v Commonwealth, 477 Mass at 534, 78 NE3d at 1158).
Civil Immigration Arrests by State and Local Law
Enforcement
Are Not Supported by the "Fellow" Officer Rule
"Under the fellow officer rule, a police officer can make a lawful arrest even without personal knowledge sufficient to establish probable cause, so long as the officer is acting upon the direction of" an officer "in possession of information sufficient to constitute probable cause for the arrest" (People v Ketcham, 93 NY2d 416, 419 [internal quotation marks omitted]). Thus, even if it is assumed that an ICE officer has probable cause to arrest for an immigration violation, the fellow officer, in this case the Sheriff's officers, must still make a "lawful" arrest. If there is no authority to arrest for a civil matter, such arrest cannot be considered "lawful." To adopt the position advocated by the Sheriff here would permit state and local law enforcement to assume the authority of an ICE officer, though not granted by state law, based upon nothing more than a request from ICE.
[*7]State and Local Law Enforcement Are Not
Authorized by Federal Law to Make Civil Immigration Arrests
Under the circumstances presented here, having concluded that New York law does not authorize state and local law enforcement officers to execute arrests for federal civil immigration violations, we must now consider whether federal law conveys such authorizations. Assuming, without deciding, that the Congress may constitutionally convey authority to state and local officials to effectuate arrests which state law does not authorize, we conclude that the Congress has not done so with regard to the circumstances presented by this case.
Federal Rules of Criminal Procedure rule 4(c)(1) governs the execution of federal arrest warrants and states that a federal arrest warrant shall be executed by a "marshal or other authorized officer." State law enforcement officers, including New York state and local officers who are empowered by New York law to execute arrest warrants generally, may execute federal arrest warrants in particular (see People v Floyd, 56 Misc 2d 373 [Sup Ct, Crim Term, Queens County], affd 33 AD2d 795, revd on other grounds, 26 NY2d 558; United States v Polito, 583 F2d at 51; United States v Bowdach, 561 F2d 1160, 1167-1168; People v LaFontaine, 92 NY2d 470, 475). However, the arrest warrants referenced in the Federal Rules of Criminal Procedure are either signed by a judge (see Fed Rules Crim Pro rule 4[b][1][D]) or by the clerk of the court (see Fed Rules Crim Pro rule 9[b][1] [arrest warrant on an indictment]; see United States v Smith, 424 F3d 992, 1008 [9th Cir]; United States v McLain, 559 F Supp 2d 983, 992 [D Minn]). While there is no question that New York law enforcement officers may execute federal court arrest warrants issued for the purpose of bringing to court individuals accused of the commission of federal immigration crimes, the ICE warrant at issue here was not issued in the context of a criminal action and was not signed by, or on behalf of, a court and was not returnable in a court. Thus, the Federal Rules of Criminal Procedure do not empower New York state and local law enforcement officers to execute ICE administrative arrest warrants.
The Sheriff, supported by the Department of Justice, argues that the Immigration and Nationality Act permits state and local officers to cooperate with ICE detainers and warrants. It is the policy and practice of the Sheriff to cooperate with the federal immigration authorities, doing so at the request and direction of ICE. The Department of Justice asserts that, without such cooperation, removable aliens would be released into local communities, where it is harder and more dangerous for ICE to take custody of them and where they may commit more crimes. We express no view on the desirability of the policy in favor of intergovernmental cooperation, which is not properly a matter for consideration by a neutral court of law. As far as the law is concerned, however, while state and local law enforcement officers are indeed permitted to cooperate with the federal authorities, and specifically with ICE, there is no authority for that cooperation to extend to the undertaking of actions not authorized by state law.
"Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer" (Arizona v United States, 567 US at 408). The Immigration and Nationality Act authorizes the Secretary of the DHS to grant authority to specific officers by means of a formal agreement with a state or local government, known as 287(g) agreement, that allows such officers to perform a function of an immigration officer in relation to "the investigation, apprehension, or detention of aliens in the United States" (8 USC § 1357[g][1]). Officers covered by these agreements are subject to the Secretary's direction and supervision (see 8 USC § 1357[g][3]). The agreements reached with the Secretary must contain written certification that officers have received adequate training to carry out the duties of an immigration officer (see 8 USC § 1357[g][2]). Such agreements are only valid "to the extent consistent with State and local law" (8 USC § 1357[g][1]).
The Sheriff does not have a 287(g) agreement with DHS. Rather, the Sheriff has long had an agreement with the United States Marshals Service pursuant to which federal detainees may be housed at the Riverhead facility. In October 2017, the agreement was modified to add ICE as an additional party. Thus, while the Sheriff has an agreement in place pursuant to which he may house federal detainees, including those detained by ICE, there is no 287(g) agreement in place conveying to members of the Sheriff's Office the authority of an immigration officer and, specifically, the authority to effectuate civil immigration arrests. We do not have occasion here to address any issues with respect to 287(g) or other formal agreements.
Another provision of the Immigration and Nationality Act permits the Secretary of [*8]DHS to deputize state or local officers, subject to the consent of the head of the particular department or agency, when there is "an actual or imminent mass influx of aliens arriving . . . requiring an immediate . . . response" (8 USC § 1103[a][10]). State and local officers are also permitted to arrest and detain an alien illegally present in the United States who has been previously convicted of a felony and was deported or left after the conviction—such conduct is considered a federal crime (see 8 USC § 1252c[a]). However, this authority is also only granted to "the extent permitted by relevant State and local law" (id.), and, in any event, the narrow circumstances articulated in this provision are not present in this case.
The Immigration and Nationality Act contains a further provision stating that "any officer or employee of a State or political subdivision of a State" may "cooperate with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States" without any formal agreement (8 USC § 1357[g][10][B]). This provision is not redundant of the provision with respect to formal agreements. Where a formal agreement is in place, state and local officers become de facto immigration officers competent to act on their own initiative (see City of El Cenizo, Texas v Texas, 890 F3d at 179-180), something that they cannot otherwise do (see Arizona v United States, 567 US at 410). The provision for informal cooperation does not allow for unilateral enforcement activity by local officers.
The United States Supreme Court has stated, with respect to this provision, that "[t]here may be some ambiguity as to what constitutes cooperation under the federal law; but no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government" (Arizona v United States, 567 US at 410). Here, the Sheriff's determination to further detain inmates because of an ICE arrest waiver is dependent upon a request from ICE, which is made in the form of the accompanying detainer.
While the provision for informal cooperation does not explicitly state that it is dependent upon consistency with state and local law, the petitioner here asserts that such a limitation should be read into the statute. In contrast, the Sheriff and the Department of Justice argue that the arrest and detention of individuals subject to ICE detainers is a permissible cooperation with a request from the federal government, distinguishable from a unilateral decision by state or local law enforcement to arrest an individual.
The submissions of the parties and amici draw upon Arizona v United States (567 US 387) for their respective positions, but Arizona did not consider the issue presented here. Rather, in that case, the United States Supreme Court held that a state statute authorizing local law enforcement officers to make unilateral decisions as to when they would arrest an alien they suspected to be removable was preempted by federal law, which exclusively confers such authority upon federal immigration officers (see id. at 410). As to section 1357(g)(10), the Court specifically noted that "[t]here may be some ambiguity as to what constitutes cooperation under the federal law" (Arizona v United States, 567 US at 410), but such unilateral decision-making could in no way be considered cooperation "absent any request, approval, or other instruction from the Federal Government" (id.). Arizona does not support the assertion by the Sheriff and the Department of Justice that the informal cooperation provision explicitly authorizes local law enforcement to arrest aliens pursuant to ICE detainers. Likewise, contrary to the arguments of the petitioner and the other amici, Arizona does not forbid such arrests, as the Supreme Court suggested that cooperation could be based upon a "request, approval, or other instruction" from ICE (id. at 410). Moreover, the detention at issue here, initiated by an ICE request, is far different from the unilateral arrests considered by the Supreme Court in Arizona.
In Lunn v Commonwealth (477 Mass 517, 78 NE3d 1143), the Supreme Judicial Court of Massachusetts examined the same issues presented in the case sub judice on similar facts. The court held that the informal cooperation provision—Section 1357(g)(10)—does not confer "authority on State and local officers to make arrests pursuant to civil immigration detainers, where none otherwise exists" under state law (Lunn v Commonwealth, 477 Mass at 535, 78 NE3d at 1158). The court reasoned that "[i]n those limited instances where the [Immigration and Nationality Act] affirmatively grants authority to State and local officers to arrest, it does so in more explicit terms than those in § 1357(g)(10)" (id. at 1159).
The Department of Justice, in its supplemental submission, draws our attention to the [*9]Fifth Circuit decision in City of El Cenizo, Texas v Texas (890 F3d 164),[FN7] which considered challenges to a Texas state law requiring that state and local law enforcement entities cooperate with federal immigration enforcement and, among other things, comply with ICE detainer requests. El Cenizo does not guide our determination of the precise issue here, i.e., whether the informal cooperation provision in the Immigration and Nationality Act permits state and local law enforcement to enforce ICE detainers and warrants in circumstances where state law gives them no authority to do so. The Texas law at issue in El Cenizo specifically mandated that Texas law enforcement agencies comply with ICE detainer requests (see id. at 174, citing Texas Code Crim Pro art 2.251)[FN8]. Indeed, El Cenizo acknowledges this important distinction; the court found Lunn to be "easily distinguishable" because there was no Massachusetts state law authority to carry out detainer requests, while in Texas, the state law authorized state officers to carry out federal detainer requests (890 F3d at 188). Thus, having held that New York conveys no state law authority to state and local law enforcement to execute ICE detainers and administrative warrants, Lunn, and not El Cenizo, provides more compelling guidance.[FN9]
In those instances where the Congress has chosen to permit local officers to enforce federal immigration laws absent a formal 287(g) agreement, it has explicitly allowed that power only in narrowly drawn circumstances. Given that Tenth Amendment concerns may prevent the Congress from mandating that local entities enforce immigration law (see City of El Cenizo, Texas v Texas, 890 F3d at 180-181), and the resulting circumspection with which the Congress has approached the issue of state and local involvement in matters of federal immigration policy, we cannot accede to the view that the Congress, through its provision for voluntary informal cooperation, thereby authorized state and local law enforcement officers to undertake actions not allowed them by state law.
We find United States v Ovando-Garzo (752 F3d 1161, 1162 [8th Cir]), relied upon by the Sheriff and the Department of Justice, to be inapposite. There, a North Dakota highway patrol trooper had stopped a vehicle and arrested the driver for driving without a license. While speaking with two passengers from the car, whom the trooper did not want to leave on the side of the road as neither had a driver's license, the trooper began to suspect they were unlawfully in the country (see id. at 1162-1163). After the passengers admitted that they were present unlawfully, the trooper contacted United States Border Patrol, which confirmed the illegal status and indicated it would send an agent to take custody of the individuals (see id. at 1163). Because the trooper intended to transport the driver to the Sheriff's office incident to his arrest, the trooper offered to transport the passengers as well. The passengers apparently accepted this offer, they were taken with the driver to the Sheriff's office, and a Border Patrol agent subsequently took custody of the two passengers. While the Eighth Circuit stated that the trooper acted cooperatively pursuant to section 1357(g)(10), in that he communicated with Border Patrol and detained the passengers pending Border Patrol's arrival (see United States v Ovando-Garzo, 752 F3d at 1164), the court was addressing the claim of the driver to suppress evidence of his identity obtained after he had been arrested. Ovando-Garzo did not address any issue with regard to the passengers who, unlike the driver, were not charged with any crime, who were not themselves placed under arrest, and who apparently went with the trooper to the Sheriff's office voluntarily rather than remain indefinitely by the side of the road.
Conclusion
We reiterate what we said at the outset: The narrow issue in this case is whether New [*10]York law permits New York state and local law enforcement officers to effectuate civil immigration arrests, and not whether federal civil immigration officers have the authority to effectuate such arrests. Nor do we decide any issues under federal law deputizing state and local law enforcement officers to act as federal immigration officers. Determining only the narrow issue before us, we conclude that the Sheriff's policy, issued on December 2, 2016, directing the retention of prisoners, who would otherwise be released, pursuant to ICE detainers and administrative warrants is unlawful, and that Francis's detention by the Sheriff on December 11, 2017, which detention commenced after the termination of Francis's court proceeding that day, was thus unlawful. While the Sheriff asserts that Francis was in the custody of ICE following his return to the correctional facility from the courthouse, we find that he was in the Sheriff's custody until Francis was actually taken into custody by duly authorized ICE officers. The relief requested by the petitioner of immediate release of Francis from the Sheriff's custody is no longer available because Francis is no longer in the Sheriff's custody.
Accordingly, the writ is sustained, and the detention of Susai Francis by the Sheriff of Suffolk County on December 11, 2017, which detention commenced after the termination of Francis's court proceeding that day, was unlawful.
BALKIN, LEVENTHAL and HINDS-RADIX, JJ., concur.
ADJUDGED that the writ is sustained, without costs or disbursements, and the detention of Susai Francis by the Sheriff of Suffolk County on December 11, 2017, which detention commenced after the termination of Francis's court proceeding that day, was unlawful.
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1:One of the Justices who participated in the oral argument has since been recused and the author of this opinion has been substituted, having had the benefit of reading all of the submissions and viewing the video recording of the oral argument (see 22 NYCRR former 670.1[c]).

Footnote 2: A CPLR article 78 proceeding seeking, inter alia, to enjoin the Nassau County Sheriff from detaining persons beyond their judicially authorized release date based on the filing of ICE detainers and warrants was denied in Matter of Chery v Sheriff of Nassau County (2015 NY Slip Op 32774[U] [Sup Ct, Nassau County]).

Footnote 3: We note the decision in Matter of Rojas v Suffolk County Sheriff's Off. (59 Misc 3d 707 [Sup Ct, Suffolk County]), where the Supreme Court held that a detainee's challenge to the same policy as challenged here was not moot but denied the challenge on its merits.

Footnote 4: As an example, it is a crime for an alien to enter the United States illegally (see 8 USC § 1325[a]).

Footnote 5: Similar provisions apply to peace officers acting pursuant to their special duties (see CPL 140.25). 

Footnote 6: We recognize that the rule may be different elsewhere (see Tenorio-Serrano v Driscoll, 324 F Supp 3d 1053 [D Ariz] [finding uncertainty as to common-law powers of Arizona sheriffs]).

Footnote 7: The Department's supplemental briefing discussed the Fifth Circuit's decision, published on March 13, 2018 (885 F3d 332). However, on May 8, 2018, the Fifth Circuit withdrew that opinion and substituted a different opinion, reported at 890 F3d 164, without change in substance insofar as the issues involved here are concerned.

Footnote 8: The Texas statute contains an exception which permits law enforcement not to comply with a detainer if shown proof that the individual is a United States citizen or has lawful immigration status (see City of El Cenizo, Texas v Texas, 890 F3d at 174-175, citing Texas Code Crim Pro art 2.251[b]).

Footnote 9: El Cenizo also rejected arguments that the Texas statute at issue violated the Fourth Amendment. In view of our determination on a narrow issue of New York law, we need not consider the petitioner's contention that Francis's Fourth Amendment rights were violated.